COLORADO CENT. CONSOL. MIN. CO. v. TURCK.

(Circuit Court of Appeals, Eighth Circuit. October 14, 1895.)

No. 612.

1. EVIDENCE—IMMATERIAL ERROR.
One T. brought an action against the C. Mining Co. to recover for ore extracted by it from a vein which had been recovered by T. from the C. Co., in an action of ejectment, the apex of such vein being within T.'s surface location, though it extended under the C. Co.'s location. Upon

the trial, the C. Co.'s superintendent, while testifying, was asked questions calling for his knowledge of the amount of development necessary to show where the apex of the vein was, and his belief as to the right of the C. Co. to work such vein. The patents of the C. Co. for its location were also offered, as was evidence to show that the ore taken by it was from the part of the vein within the limits of the C. Co.'s location. *Held*, that the exclusion of all such evidence, even if it was admissible to establish the C. Co.'s good faith, was not a material error; the facts admissible for such purpose having been either conceded or substantially proven during the trial, and other undisputed facts having afforded a better means of judging of the C. Co.'s good faith than the evidence offered; and it also appearing, from the amount of the verdict in T.'s favor, taken in connection with the evidence of the value of the ore extracted, that the jury must have found that the C. Co. acted in good faith, and charged it only with the net profits on the ore extracted.

2. MINING CLAIMS—SPUR VEINS.

The vein recovered by T., having its apex within his location, dipped to the north, and extended under the C. Co.'s location, which lay north of T.'s. It appeared that there were certain ore bodies lying south of the vein and under it, with reference to vertical direction, and that ore had been taken by the C. Co. from such ore bodies. The court instructed the jury that these ore bodies, since they could upon no theory have a separate existence, extending through T.'s vein, and giving them an outcrop on the C. Co.'s location, should be regarded as having some connection with and belonging to T.'s vein, which must entitle him to whatever was in them. *Held* no error.

3. SAME—UNLAWFUL EXTRACTION OF ORE—MEASURE OF DAMAGES.

The proper measure of damages in an action for unlawfully taking ore from plaintiff's vein, when the defendant was not a willful trespasser, is the value of the ore taken, less the cost and expense of breaking it and bringing it to the mouth of the mine; and where the ore has been taken out by a lessee of the defendant, who received a royalty thereon, such royalty may be taken as his net profit.

In Error to the Circuit Court of the United States for the District of Colorado.

R. S. Morrison (Charles J. Hughes, Jr., on the brief), for plaintiff in error.

Willard Teller and H. M. Teller (H. M. Orahood and E. B. Morgan, on the brief), for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge. This suit was brought by John Turck, the defendant in error, against the Colorado Central Consolidated Mining Company, the plaintiff in error, to recover damages for wrongfully extracting silver-bearing ore from a certain lode or vein which belonged at the time to the plaintiff, John Turck. The plaintiff's title to the lode in controversy was established by a suit in ejectment between the same parties, which was brought to this court for review, and was decided at the May term, A. D. 1892. Mining Co. v. Turck, 4 U. S. App. 290, 2 C. C. A. 67, and 50 Fed. 888; Id., 12 U. S. App. 85, 4 C. C. A. 313, and 54 Fed. 262. By reference to the decision in that case, it will be observed that the parties to the suit at bar were the owners of adjoining mining claims; the plaintiff, John Turck, being the owner of the Aliunde Tunnel lode No. 2, and the defendant company being the owner of the Colorado Central lode,

which adjoined the Aliunde claim on the north. In the ejectment suit it was contended by the plaintiff, John Turck, that a vein which belonged to him, because its true apex was within the side lines of the Aliunde claim, in its descent into the earth, had passed outside of the side lines of the Aliunde claim, extended downward vertically, and within the side lines of the Colorado Central location; that the defendant company, finding said vein within its own side lines, had there taken possession of it as its own property, and was wrongfully and unlawfully extracting the ore therefrom, and converting the same to its own use. This contention on the part of the plaintiff was eventually sustained. After two trials before a jury in the circuit court of the United States for the district of Colorado, in each of which the plaintiff recovered a verdict, it was finally adjudged and determined that the plaintiff, John Turck, was entitled to have and recover possession of the lode by him claimed, which was described in the judgment as follows:

"All that part of the, Aliunde Tunnel lode No. 2 that lies outside of and north of the side lines of said lode claim, and within lines parallel to the end lines of the said Aliunde Tunnel lode No. 2, one of which shall intersect the southwest corner stake of the Colorado Central location survey No. 261, and the other parallel thereto, drawn through the point of intersection between the north side line of the said Aliunde Tunnel lode No. 2 (it being at that place identical with the south side line of the said Colorado Central lode claim) and, the southerly line of the Subtreasury lode mining claim, and being five hundred and twenty (520) feet in length on said vein, situate in Argentine mining district, county of Clear Creek, and state of Colorado; and that he have a writ of possession therefor."

Subsequent to the recovery of said judgment, which was affirmed by this court (Mining Co. v. Turck, supra), the present action was brought to recover the value of the ore that had been wrongfully appropriated by the defendant company. The suit in ejectment was commenced in December, 1885; and after that date, and until some time in the year 1892, the defendant company continued to work the lode within its own side lines, which was claimed by the plaintiff, and to remove the ore therefrom. In the year 1888, the plaintiff applied to the circuit court of the United States for the district of Colorado for an injunction to restrain the defendant company from taking or removing any more ore from the lode in controversy. On the hearing of that application, the circuit court denied an injunction; but, in lieu thereof, it made an order requiring the defendant company to make and file monthly reports of all ore that it might thereafter extract from the vein in controversy. Very much of the evidence offered and relied upon by the plaintiff on the trial of the present case to establish the amount of his damages was contained in these reports so made and filed by the defendant company pursuant to the aforesaid order of the circuit court.

Confining ourselves to the alleged errors that have been assigned upon the present record, it will be necessary, in the first instance, to notice some assignments which relate to the exclusion of certain evidence that was offered by the defendant company. Complaint is made that the circuit court erred in refusing to allow a witness by the name of Ernest Le Neve Foster, who was the defendant's super-

intendent from and after January 1, 1890, to answer the following questions:

"Q. When this ore was first cut, what was the amount of development necessary to show where its apex was; that is, if it was followed up by a raise from a level directly to the foot of the wash?" "Q. I want to ask this specific question: At the time the work was done by yourself, as superintendent, on the ground afterwards recovered by Mr. Turck, where did you believe that the apex of that vein was?" "Q. At the time this ore was taken out, what was your belief as to its being a portion of the vein of the Colorado Central or some other vein?" "Q. How long before the date of the final trial was it that apex developments, to show where they were, were completed on both sides?" "Q. Do you know whether your company was advised that in law they had a good defense, or what they were advised in regard to their defense to the Turck suit?"

Complaint is also made that the court erred in excluding the patents issued by the United States to the defendant company for the Colorado Central lode and the Subtreasury lode, and in refusing to permit the defendant company to show that the ore by it taken from the plaintiff's lode was all taken from that part of the vein which lay within the side lines of the Colorado Central lode extended downward vertically.

We are satisfied by an inspection of the entire record that no material error was committed in excluding the aforesaid testimony. It was testimony that was offered for the sole purpose of affecting the measure of damages by showing that, in appropriating the plaintiff's ore during a period of five or six years, the defendant company had acted throughout in good faith, and was therefore entitled to an allowance for all the expenses that it had incurred in mining the ore, and that it was only chargeable, by way of damages, with the net profit that it had realized by working the plaintiff's vein. Even if we should concede that the facts which some of the foregoing questions were calculated to elicit were probably admissible for the purpose of establishing the defendant company's good faith, still it is apparent that such facts as may have been admissible for the purpose last stated were either conceded or were proven substantially during the progress of the trial, and that under the charge of the court they were doubtless considered by the jury, and given their full weight. For example, the complaint on which the case was tried showed that the plaintiff only sued to recover the value of such ore as had been extracted from the vein outside of his own side lines, and which lay within the side lines of the Colorado Central claim. Besides, by the maps and diagrams which were exhibited to the jury, and by the oral testimony in relation thereto, the location and physical surroundings of both mining claims and the amount of development work that had been done thereon at different periods were fully disclosed. These maps and diagrams and the testimony of various witnesses in relation thereto clearly showed the places from which the ore in controversy had been taken, and the amount of work done or necessary to be done at different periods to trace the vein in controversy to its outcrop. The maps, diagrams, and testimony also showed that the apexes of all veins within the disputed territory were covered with many feet of wash, and that it was both difficult and expensive for the defendant company to locate the apex of any vein with absolute

certainty, by following it to the surface. As these facts were either conceded or were substantially proven, it can hardly be pretended that the trial court committed a material error either in refusing to allow the witness Foster to testify that all the ore in controversy was mined underneath the surface of the Colorado Central lode, or in refusing to permit him to testify as to the amount of development work that was necessary to be done by the defendant company to establish the true apex of the vein in controversy, or in refusing to permit him to testify as to the exact date when the work that was undertaken with a view of finding the apex of the vein was completed. The jury undoubtedly had all the information with reference to these matters that was necessary to enable them to judge intelli-gently of the defendant's motives and good faith in continuing to work the lode during the existence of the controversy and after it was advised of the nature of the plaintiff's claim thereto. Nor are we able to say that a material error was committed by the trial court either in excluding the defendant's patents to the adjoining claims, or in refusing to permit the witness Foster to testify as to his belief concerning the apex and ownership of the vein in question after he became superintendent of the mine. If the patents in question were offered for the purpose of establishing the defendant's ownership of the adjoining claims, from which the ore was extracted, the proof was unnecessary, as the defendant's title to the Colorado Central and Subtreasury lodes was not denied. If the patents were offered for the purpose of showing that they were older than the patent for the Aliunde claim, then the proof was immaterial, for the reason that the plaintiff's right to the lode in controversy did not depend upon the age of his patent, but upon the fact that the apex of the lode was within the surface boundaries of the Aliunde location. Moreover, it must be borne in mind that the defendant company based its principal defense to the ejectment suit, not on the ground that its patents were older than the plaintiff's patent, but upon the ground that the apex of the lode sued for lay wholly or in part within the limits of its own surface location. Its chief contention in that suit was—and to this point it directed most of its evidence—that the lode in controversy had a broad apex, whch was bisected by a vertical plane dividing the Colorado Central lode from the Aliunde lode, and that the plaintiff could not claim any ore lying outside of his own side lines.

Concerning the refusal to permit the witness Foster to answer the questions relative to the belief which he entertained respecting the ownership of the lode in controversy and the location of its apex, it is only necessary to say that such action on the part of the trial court does not appear to us to have been so far important or prejudicial as to warrant a reversal of the case, whatever may have been the answer which this witness was prepared to give. As has already been stated, he did not take charge of the mine until January 1, 1890. The first trial of the ejectment suit occurred shortly thereafter, and resulted in a verdict for the plaintiff. Prior to that date, in following his alleged vein from the outcrop downward, the plaintiff had broken into the workings of the defendant company, and had thereupon applied for an injunction against the defendant, which resulted in an

order being made by the circuit court compelling it to make monthly reports of all ore thereafter taken from the disputed territory. We think that these and other undisputed facts afforded the jury a better means of determining whether the defendant was fairly justified in continuing to work the vein from and after the year 1890 than the testimony sought to be elicited from the witness Foster.

But, be this as it may, there is another reason why the action of the court in excluding all the testimony heretofore considered, which was offered with a view of showing the defendant's good faith, cannot be regarded as a material error. Under the instructions given by the trial court, the jury was required to determine, in the light of all the evidence and circumstances of the case, whether the defendant company had acted in good faith in continuing to work the plaintiff's vein during the whole or for any part of the time after the controversy arose as to its ownership; and an examination of the record has served to convince us that the finding of the jury on that issue must have been in favor of the defendant company, and that the damages awarded by the jury must have been assessed upon the theory that the defendant was not a willful trespasser, but that it had acted under a justifiable claim of ownership. Considering the undisputed evidence relative to the gross value of the ore that was taken from the lode in controversy and from ore fissures connected therewith, which the court held to be a part of the vein that was recovered in the ejectment suit, we can only account for the verdict rendered by the jury upon the assumption that an allowance was in fact made to the defendant company for all the expenses it had incurred in taking out the ore, except such expenses as were incident to maintaining that particular part of the mine from which the ore in controversy was taken. The jury was not authorized to make an allowance for keeping the various drifts, shafts, and tunnels in repair in that portion of the defendant's mine from which the ore in controversy was extracted, because, as the trial court held, the evidence was insufficient to show what expense had been incurred on that account that was properly chargeable to the plaintiff; but with this exception it seems evident, for the reasons above stated, that an allowance must have been made to the defendant for the full cost of mining the ore in controversy, and that the verdict represents the net profit which the jury believed the defendant company had realized, either in the form of royalties or otherwise, by appropriating the plaintiff's lode. In this view of the case, the errors assigned in consequence of the rejection of testimony that was simply offered to establish the defendant's good faith and to affect the measure of damage become immaterial.

It is further claimed by the defendant company that the trial court so ruled as to allow the plaintiff to recover "thousands of dollars" on account of ore taken out by the defendant which did not belong to the plaintiff's vein. This contention seems to be based on a ruling made by the trial judge in the progress of the trial, and on a portion of the charge hereafter quoted. During the trial a witness called by the defendant (Ernest Le Neve Foster) had stated that ore of the value of about $24,870 had been reported to the court by the defend-

ant company as ore extracted from the disputed territory, which was
not in fact taken from the vein that had been recovered by the plain-
tiff in the ejectment suit. The trial court, of its own motion, there-
upon made the following remark:

"We will not accept any such statement as that. There is a vein north of
this which is not comprehended in this judgment. There is no vein south of
that which is not comprehended. The one you call your north ore vein, lying
to the north at some distance, was not comprehended."

But the witness was, nevertheless, allowed to proceed, and to point
out the precise location of the ore bodies included in his estimate
of the ore that was not thought to be a part of the plaintiff's lode;
and it was then and there shown that ore of a value exceeding $21,000
had been erroneously included in the defendant's reports, which was
not in fact taken from the plaintiff's lode.     To that extent the claim
made in behalf of the defendant was conceded, and that sum was
evidently stricken from the reports, and was not included in the ver-
dict as a part of the plaintiff's damages.     This left a controversy,
however, as to the ownership of three lots of ore of the value of about
$3,200, that were included in the estimate made by the witness Fos-
ter as above stated.     The evidence showed that these lots of ore had
been taken by the defendant at a point 50 or 60 feet south of the
plaintiff's lode, from what was termed a "spur vein" which was con-
nected with the plaintiff's lode.     Now, for the purpose of enabling
the jury to determine, in the light of all the evidence as to its loca-
tion, what portion of the ore that had been taken out by the defend-
ant should be regarded as belonging to the plaintiff's vein, the trial
court charged the jury as follows:

"You who are mining men—that is, those of you who have had experience
in mines—will know that veins enlarge and contract. There is a swell in them
at times which gives them a considerable width, and they come down again
to narrow limits, or perhaps wholly disappear for some distance. There are
spurs and offshoots which, notwithstanding they extend to some distance in
either wall, if they go but a short distance, are still regarded as a part of the
main vein; and, while the defendant has constantly contended that there
were many of these spurs and offshoots which were of a distinct character,—
that is, should be recognized as having a separate quality and character of
their own, as distinguished from that owned by the plaintiff,—the plaintiff,
on the other hand, has claimed that the greater part, if not all, were only
branches of his own vein, and that he was entitled to everything in that ter-
ritory in virtue of his ownership of the main vein. It seems, however, to be
pretty well established that there was in that ground a north vein which had
a considerable extension towards the surface of the earth, and which should
be recognized as distinct and separable from the plaintiff's vein. It is so far
removed, it has such length and thickness, such height and depth, that it was
always regarded as having a distinct character of its own, and separable from
the other. As I understand the evidence which we have heard, the Pollard
upraise is in that vein, and I believe that a considerable part of the ore
which was mentioned in these reports, or some of them, came from that
upraise. Distinguishable from that, and lying to the south of this vein,
which was recovered by the plaintiff in the ejectment suit, were some
other ore bodies, which, as they lay under, considered with reference to
vertical direction, as they lay under that claimed by the plaintiff and re-
covered by him, they have been regarded as being tributary to it and as
part of it. One of them in particular—and I shall not be able to call the
name which the witness gave it, but it was one from which considerable
amount of ore came—stood transversely or obliquely to the plaintiff's vein,

but was upon the south side. *When the evidence came in respect to that, counsel were informed that it would be regarded as the plaintiff's vein, because we could not set up any theory that these bodies of ore, whether they were or were not immediately connected with that which was recovered by the plaintiff, had a separate existence extending through that, and giving them an outcrop of their own in the defendant's territory. Owing to the position and extension with its dip to the north of the plaintiff's vein, we felt bound to say that these underlying bodies of ore had some connection with the plaintiff's vein, which must entitle him to whatever there was in them. The result of these considerations is that what stands clearly above the plaintiff's vein, and to the north of it, he is not entitled to. What stands in that vein, and to the south of it, we regard as his property, recovered by him in the suit in ejectment to which reference has been made."*

The latter portion of what was thus said by the trial judge evidently had reference to the incident which occurred during the trial when the witness Foster was not allowed to state the legal effect of the judgment in ejectment by declaring generally that this or that body of ore was not recovered by the judgment. The whole effect of the action complained of was to compel the defendant company to account for about $3,200 which it had received as a royalty on three lots of ore that were unquestionably taken from a vein which the court held to be merely a spur or offshoot of the main lode, to which the plaintiff had established his title. The defendant's superintendent himself described the vein from which the three lots of ore in question were taken as a short vein, running south from and about at right angles to the plaintiff's main vein, and becoming barren at a point not more than 60 or 70 feet distant from the point of junction. There is certainly no evidence in this record which would warrant us in holding that it was not correctly characterized by the trial court as a mere spur or offshoot of the Aliunde vein, and, in the absence of such evidence, it cannot be successfully maintained that an error was committed to the defendant's prejudice.

Complaint is made generally of all that part of the charge in which the trial court reviewed and enumerated the circumstances which might be considered by the jury in determining whether the defendant had acted in good faith, or as a willful trespasser. We do not think that there is adequate ground for such complaint, but it is not necessary to discuss that question, for, as heretofore stated, we have become fully satisfied, by an examination of the testimony in relation to the gross value of the ore extracted from the lode in controversy, that the jury must have found in favor of the defendant on the issue to which this part of the charge is addressed, and that, in any event, the alleged error was immaterial.

There are numerous other exceptions noted in the record, which we have examined, but it would subserve no useful purpose to notice them in detail. The very number of these exceptions, and the assignments of error founded thereon, render it impossible to consider them separately without extending this opinion to an unreasonable length. We have endeavored, however, to fully express our views with respect to those exceptions on which counsel for the defendant company seem to place most reliance. In this connection, it is important to observe that the trial court instructed the jury, in substance, that the measure of the plaintiff's recovery, provided the defendant was not a willful trespasser, was the value of the ore taken out of the vein in controversy, deducting the cost and expense of

breaking the ore and bringing it to the surface or to the mouth of the mine. The jury was further instructed that where ore had been broken and taken out by lessees of the defendant company, and the latter had received only a royalty on the ore, the royalty so received might be taken to represent the net profit that had been realized by the defendant, and that the plaintiff's right to the royalty so received was full and complete. In this same connection, the trial judge remarked that the evidence showed that most of the ore in controversy had been taken out by lessees, so that it is fair to presume that the greater part of the damages were assessed by allowing the plaintiff the royalties which had been received by the defendant company. Now, although our attention has been directed to a number of decisions where the measure of damage in cases of this character has been discussed, yet we do not understand it to be distinctly claimed in argument that either of the foregoing instructions was erroneous. On the contrary, it is expressly conceded in the brief "that the amount of royalty received by the defendant might [properly] be taken as the basis of damages"; and to that effect, in substance, the jury was advised and instructed.

The trial court, as heretofore stated, did express the opinion, in which we feel bound to concur, that the defendant had failed to offer such testimony as would enable the jury to determine with any degree of certainty what part, if any, of the gross expenses incurred in superintending and maintaining its entire mine should be apportioned to that part of the mine from which the ore in controversy was extracted. The trial court likewise intimated grave doubts as to whether the defendant company had offered any satisfactory evidence of the cost of breaking the ore in the vein, and elevating it to the surface. This part of the charge is criticised at some length by counsel for the company. We think, however, that the argument on this point is not sufficient to establish a material error, inasmuch as the trial court, at the conclusion of the charge, finally submitted the question of such cost to the jury, and left them at liberty to determine how much should be deducted on that account from the value of the ore at the mouth of the mine that had been taken out by the defendant itself. In the same connection, it practically told the jury that the royalty received by the defendant might be considered as the measure of damage for the taking of such ore as had been mined and raised to the surface by its lessees.

In conclusion, we deem it proper to say that in cases of this kind, where a person is compelled by law to account and pay for ore that was found many feet beneath the surface of the earth, and within the side lines of his own claim, we are aware of the natural disposition of all litigants against whom a recovery is had to regard the recovery as excessive, and perhaps as unjust and oppressive. For that reason, we have approached the consideration of this case with an earnest desire to eliminate from the verdict every item that was not justly chargeable to the defendant company by a correct application of the rules of law applicable to such cases. But an examination of the record has served to convince us that no substantial reasons are disclosed for disturbing the verdict of the jury, wherefore the judgment of the circuit court must be, and the same is hereby, affirmed.